**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-15-08076-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Kyle Filbert Gray (01), Devan Edward Leonard (02), | |
| Defendants. | |

Defendant Kyle Gray has filed a motion to suppress the statement of his co-defendant, Devan Leonard.  Doc.  44.  Defendant Leonard subsequently filed a motion to suppress the same statement.  Doc. 52.  The motions are fully briefed, and the Court held an evidentiary hearing on November 24, 2015.  Doc. 63.  For the reasons stated below, the Court will grant Defendant Leonard's motion and deny Defendant Gray's motion.

**I.   Background.**

On  March  18,  2015,  FBI  Special  Agent  Ryan  Butler  and  Navajo  Criminal Investigator  Darrell  Boye  interviewed  Devan  Leonard  about  the  disappearance  and murder of T.S.  At the time, Leonard was in tribal custody at the Window Rock Detention Center for an unrelated matter.  He was 25 years old and had completed two years of college.  The officers spoke with Leonard in a small room with a table and three chairs. The interviewing officers were dressed in plain clothes, and, although Butler was armed, his weapon was not visible.  Leonard was also in plain clothes and unrestrained.  During

the interview, Leonard requested and was provided a candy bar and water.  The interview began at 10:32 a.m. and lasted about two hours.

Agent Butler started the interview in this way: "I want to kind of tip my hand and tell you a little bit about my investigation, tell you a little bit about what I've done, because I really think it's in your best interest to – to talk to me about this."  Doc. 52-1 at 5-6.  Butler said this was not something he normally does, but he wanted to be "up front" with Leonard because it was "the fair thing to do."  *Id.* at 5, 7.  Butler told Leonard "I want to tell you about my case.  But I can't – I can't really do that until we go over your rights."  *Id.* at 8.

Butler then orally advised Leonard of his *Miranda* rights.  Butler told Leonard that he has "the right to talk to a lawyer for advice before we ask you any questions at all.  Okay?  You – you – you know, you don't have to talk to us alone."  *Id.* at 10.  Butler advised Leonard:

> If you can't afford a lawyer, one will be appointed to you before any question if you wish.  Now, that's – that's more for people that have been arrested.  I mean even though you're being held federal – or tribally, you're not under arrest from me.  You know, I'm not arresting you.  But all that – basically, all that is trying to do is reinforce the point that even if you're worried that you can't pay for a lawyer, there's ways that we can get you a lawyer if – if, you know, you're worried about it.  Okay?

*Id.* at 10-11.  Butler told Leonard "[i]f you decide to answer questions now without a lawyer present, you have the right to stop answering at any time."  *Id.* at 11.

Butler asked Leonard to review the FBI's Advice of Rights form, which stated:

> You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Doc. 52-2 at 2.  After reviewing the form, Leonard sought to clarify what would happen if he signed it.  Butler told Leonard that signing the form means "it makes sense to you and you understand" the form.  Doc. 52-1 at 12.

- 2 -

After Leonard confirmed that he understood the form, Butler asked him to read aloud the "Consent" portion of the form, which states: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Doc. 52-2 at 2.  Immediately after Leonard read this, the following exchange occurred:

> **Leonard**:  And I want a lawyer present.
>
> **Butler**:  You want a lawyer present?  Okay.
>
> **Leonard**:  That's just how I was – that's what [inaudible].
>
> **Butler**:  Okay.  That's fine.  That's fine.  You don't have to answer any questions.  You – if you want to have a lawyer present, then – then – then that's fine.  I'm just going to note on here that – that you want to have a lawyer.
>
> **Leonard**:  I need to call my – my lawyer.
>
> **Boye**:  Who is he?
>
> **Butler**:  Okay.
>
> **Boye**:  Let me call him for you.
>
> **Leonard**:  I got to talk to my family first.
>
> **Butler**:  Okay.
>
> **Leonard**:  It says that if I can't afford it, then I'll have one appointed to me.
>
> **Butler**:  Okay.  All right.
>
> **Boye**:  Well, the only way – the only way you can have one appointed for you is if you were arrested.  The Court appoints that lawyer for you.
>
> **Leonard**:  It's like my own public defender, huh?
>
> **Butler**:  Exactly.  Exactly.
>
> **Boye**:  Yeah.  So that's the only way you can get – you have to be arrested for you to get that appointment.
>
> **Butler**:  Yeah.
>
> **Leonard**:  So fuck it.  Let me sign that then, I guess.

Doc. 51-2 at 12-14.

After this exchange, Butler sought to clarify Leonard's position.  Butler reiterated that Leonard could only have a public defender appointed upon arrest and that he was not

- 3 -

under arrest at the time of the interview.  *Id.* at 14.  Butler then said again: "I want to tell you about my investigation and let you know kind of where it stands right now and how it involves you.  Because right now it does involve you.  And I want to explain that so you know exactly how the cards are." *Id.*

Butler told Leonard "since you said earlier, I want to talk to a lawyer, I need you to specifically tell me that you don't want to talk to a lawyer and it's okay to keep talking." *Id.* at 15.  After Leonard expressed his interest in Butler's investigation, Butler once again advised Leonard of his *Miranda* rights both orally and by using the FBI's Advice of Rights form.  Leonard, Butler, and Boye each signed the form.  Butler told Leonard that "all that signature says is that you understand those rights, you understand you can stop at any time, but you want to at least start and hear what I have to say." *Id.* at 16.  At this point, Butler began to interview Leonard about T.S.'s murder.  Leonard made statements implicating himself and Gray in the murder.  After nearly two hours, the interview was terminated at Leonard's request.

## II.    Analysis.

Leonard and Gray both seek to suppress Leonard's March 18, 2015 statement.  Because they raise different issues, the Court will consider their arguments separately.

### A.    Leonard's Right to Counsel Was Denied After Unequivocal Invocation.

Leonard asserts that he received constitutionally inadequate *Miranda* warnings and that the interrogation should have halted immediately after he unambiguously invoked his right to counsel.  Under relevant Supreme Court and Ninth Circuit precedent, the Court agrees.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," and the Sixth Amendment grants criminal defendants the right to "assistance of counsel."  U.S. Const. amends. V, VI.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted prophylactic measures to guarantee that a suspect is advised of his Fifth and Sixth Amendment rights before a custodial interrogation.  *Id.* at 444-45.

Fifteen years later, in *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court provided further guidance.  The Court held that when a suspect requests counsel, "'the interrogation must cease until an attorney is present.'"  *Id.* at 482 (quoting *Miranda*, 384 U.S. at 474).  The Supreme Court explained:

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.  [An accused,] having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484-85.

In *Smith v. Illinois*, 469 U.S. 91 (1984), the Supreme Court characterized this as a "bright-line rule that *all* questioning must cease after an accused requests counsel."  *Id.* at 98 (emphasis in original) (quotation marks omitted).  *Smith* further explained that "[i]n the absence of such a bright-line prohibition, the authorities through badgering or overreaching – explicit or subtle, deliberate or unintentional – might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance."  *Id.* (quotation marks and brackets omitted).

Thus, once a criminal suspect in a custodial interrogation requests a lawyer, law enforcement officers may not continue the questioning without counsel present unless the suspect himself initiates further communication.  *Edwards*, 451 U.S. at 484-85.  For this rule to apply, the suspect must state his desire for counsel unambiguously.  *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010); *United States v. Younger*, 398 F.3d 1179, 1186-88 (9th Cir. 2005).

The parties in this case agree that Leonard was in custody when questioned, triggering his *Miranda* rights.  It is also clear that Leonard invoked his right to counsel when, after reviewing the FBI's Advice of Rights form, he said "I want a lawyer present."  Doc. 51-2 at 12.  Leonard was not provided counsel during the interview.

The parties disagree on the significance of the exchange that occurred immediately after Leonard invoked his right to counsel.  Leonard argues that the interview should have ended immediately.  The government contends that the conversation following Leonard's invocation created ambiguity as to his request, and that the ambiguity permitted the officers to proceed after giving Leonard a second *Miranda* warning.  The government also argues that Leonard reinitiated discussion after he invoked his right.

The Ninth Circuit recently issued an instructive en banc decision.  In *Sessoms v. Grounds*, 776 F.3d 615 (9th Cir. 2015) (en banc), two detectives interviewed a suspect who had surrendered after learning that there was a warrant for his arrest.  *Id.* at 618.  Shortly after the detectives introduced themselves, the following exchange took place:

**Suspect**:  There wouldn't be any a – a lawyer present while we do this?

**Detective**:  Well, uh, what I'll do is, um –

**Suspect**:  Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer.

*Id.* at 619.  Instead of ending the interview at this point, the detectives pressed on, convincing the suspect that it was in his best interests to talk to them without a lawyer.  *Id.*  The detectives then provided *Miranda* warnings, and the suspect "hesitated, shrugged his shoulders, and said, '[l]et's talk,' proceeding to implicate himself in the crime."  *Id.*  The suspect was convicted after the trial court denied his motion to suppress the statements he made to the detectives.  *Id.*  The conviction was affirmed both by the state courts and a federal district court on habeas review.  *Id.* at 619-20.

The Ninth Circuit reversed, finding that "[t]he only reasonable interpretation of 'give me a lawyer' is that [the suspect] was asking for a lawyer."  *Id.* at 627.  The court also found that "the detectives, much as *Miranda* warns, overwhelmed [the suspect] and persuaded him 'out of exercising his constitutional rights.'"  *Id.* at 628 (quoting *Miranda*, 384 U.S. at 455).  The court held that "under the circumstances, a reasonable law enforcement officer would have understood [the suspect's] statements as an unambiguous request for counsel, which should have cut off any further questioning under clear

Supreme Court precedent." *Id.* at 621.

Other Ninth Circuit cases are in accord.  In *Alvarez v. Gomez*, 185 F.3d 995 (9th Cir. 1999), the investigating officers gave the suspect *Miranda* warnings and the following exchange took place:

> **Suspect**: *Can I get an attorney right now, man?*
>
> **Officer 1**:  Pardon me?
>
> **Suspect**: *You can have attorney right now?*
>
> **Officer 1**:  Ah, you can have one appointed for you, yes.
>
> **Suspect**: *Well, like right now you got one?*
>
> **Officer 1**:  We don't have one here, no.  There's not one present now.
>
> **Officer 2**:  There will be one appointed to you at the arraignment, ah, whether you can afford one.  If you can't one will be appointed to you by the court.
>
> **Suspect**:  All right.
>
> **Officer 1**:  [Inaudible].
>
> **Suspect**:  I'll – I'll talk to you guys.

*Id.* at 996-97 (emphasis in original).  The court held that "the relevant authority reveals that [the suspect's] thrice-repeated questions, when considered together, constituted an unequivocal request for an attorney." *Id.* at 998 (citing *Smith*, 469 U.S. at 97) (additional citations omitted).  At that point, the officers should have immediately discontinued the interview until the suspect was able to meet with a lawyer or until the suspect resumed the interview on his own initiative. *Id.*  The Ninth Circuit held that the suspect's later *Miranda* waiver was ineffective because it occurred during further police-initiated questioning. *Id.*; *see also Lujan v. Garcia*, 734 F.3d 917, 932-33 (9th Cir. 2013) (granting habeas relief where police officers continued interviewing a suspect after he unambiguously invoked his right to counsel).

In this case, Leonard unambiguously invoked his right to counsel.  He could not have said it more clearly: "I want a lawyer present."   Doc. 51-2 at 12.  This invocation was at least as clear as the invocation in *Sessoms* and clearer than the invocation in

*Alvarez.*

Immediately following this statement, the conversation turned to how Leonard could obtain a lawyer.  He said he wanted to call a lawyer and call his family.  Instead of ending the interview in light of Leonard's clear indication that he wanted a lawyer, the officers made comments – similar to the comments made in *Alvarez* – which suggested that Leonard could not obtain a lawyer at that time: "[w]ell, the only way – the only way you can have one appointed for you is if you were arrested.  The Court appoints that lawyer for you. . . . So that's the only way you can get – you have to be arrested for you to get that appointment."  Doc. 51-2 at 13.  The officers had already told Leonard he was not being arrested that day (*id.* at 10), so the clear implication was that no lawyer could be provided at that time.  It was in direct response to these statements that Leonard said "[s]o fuck it.  Let me sign that then, I guess."  *Id.* at 14.[1]

Leonard did not reinitiate the interview.  Between clearly invoking his right to counsel and the officer's statements that he could obtain a lawyer only when he was arrested, the only comments Leonard made concerned how he might obtain counsel:

**Leonard**: I need to call my – my lawyer.

**Boye**: Who is he?

**Butler**: Okay.

**Boye**: Let me call him for you.

**Leonard**: I got to talk to my family first.

**Butler**: Okay.

**Leonard**: It says that if I can't afford it, then I'll have one appointed to me.

*Id.* at 13.  The officers then told Leonard that he could obtain a lawyer only upon being arrested, which clearly was not going to happen that day, and Leonard said in apparent

---

[1] The officers had made a similar statement during the *Miranda* warning.  After telling Leonard that counsel would be appointed for him, they said "that's more for people that have been arrested . . . you're not under arrest from me.  You know, I'm not arresting you."  Doc. 51-2 at 10.

1  resignation: "[s]o fuck it.  Let me sign that then, I guess."  *Id.* at 14.[2]

2      After this exchange, the officers did not proceed immediately with the interview.

3  Apparently recognizing that Leonard had invoked his rights, they sought to advise him of

4  his *Miranda* rights again.  There were two problems with this approach.  First, because

5  Leonard had unambiguously invoked his right to counsel, the interview should have

6  ceased as the Supreme Court has instructed.  Second, the officers again clearly implied

7  that Leonard could not obtain counsel at that time: "[n]ow, like – like [Officer Boye]

8  said, for you to get the public defender appointed, that happens when – when somebody

9  is arrested.  Okay?  And – and I'm not arresting you right now."  *Id.*  And also: "[a]nd if

10 you can't afford a lawyer, one will be appointed for you before any questioning.  That's,

11 you know, if – if you're arrested."  *Id.* at 16.  The Court does not view this second

12 attempt at a *Miranda* warning as curing the problem.

13     In summary, under clear Supreme Court and Ninth Circuit law, the interviewing

14 officers should have stopped the interview immediately after Leonard invoked his right to

15 counsel.  They did not, and the Court will grant Leonard's motion to suppress.

16     **B.**    **Leonard's Statement Was Voluntary.**

17     Gray cannot invoke Leonard's right to counsel, and therefore cannot obtain

18 suppression on the ground described above.  A third party lacks standing to challenge the

19 admission of a statement taken without the benefit of *Miranda* warnings because the

20 rights protected by *Miranda* are personal.  *Byrd v. Comstock*, 430 F.2d 937, 938 (9th Cir.

21 1970).  Gray may argue, however, that use of Leonard's statement at trial would violate

22 Gray's due process rights because the statement was involuntary.  The Ninth Circuit has

23 stated that "illegally obtained confessions may be less reliable than voluntary ones, and

24 thus using a coerced confession at another's trial can violate due process."  *Douglas v.*

25 *Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003) (citation omitted).

26

27       [2] Defense counsel noted during the evidentiary hearing that there is a procedure for
   suspects to obtain advisory counsel from the federal public defender's office before they
28 are arrested.  Agent Butler testified at the evidentiary hearing that he was not aware of
   that fact.

Gray contends that the officers used coercive interrogation tactics in their interview of Leonard.  He argues that the officers "employ[ed] a series of promises, threats and deception" to overcome Leonard's free will.  Doc. 44 at 2.  The Court is not persuaded.

"In determining the voluntariness of a confession, a court 'examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.'"  *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).  The Court must consider the totality of the circumstances, including "'the characteristics of the accused and the details of the interrogation.'"  *Id.* (quoting *Dickerson*, 530 U.S. at 434).  When a confession is challenged, the government must establish voluntariness by a preponderance of the evidence.  *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

Gray does not argue that Leonard's personal characteristics weigh in favor of concluding that his statement was involuntary, nor could he.  At the time of the interview, Leonard was 25 years old and had completed two years of college.  There is no evidence that he was mentally incompetent.  Because Leonard was in tribal custody the night before the interview, there is no indication that he was under the influence of drugs or alcohol.  The audio recording of the interview and Agent Butler's testimony suggest that Leonard, although soft-spoken, was lucid and engaged throughout the interview.

Nor was the setting of the interview unduly coercive.  Leonard and the officers sat in a small room with a table and three chairs.  The interview began at a reasonable hour and lasted a reasonable amount of time.  The interviewing officers were dressed in plain clothes without visible weapons.  Leonard was also in plain clothes.  He was provided a candy bar and water during the interview.  The interview ended at Leonard's request.

The Court has listened to a recording of a portion of the interview and relies on Agent Butler's credible testimony for a description of the rest of the interview.[3]  The

---

[3] Agent Butler testified that his digital recorder ran out of recording space during the interview, without his knowledge, resulting in only part of the interview being recorded.

officers spoke with Leonard in a calm, conversational tone.  They did not raise their voices, use force, or make threats.  Leonard was never restrained.  The officers spoke in English, as did Leonard, and it was clear to Agent Butler that Leonard understood the conversation.

Although the officers failed to honor Leonard's invocation of his right to counsel and thereby violated his *Miranda* rights, it remains relevant to the voluntariness inquiry that Leonard was told repeatedly that he had the right to remain silent and could end the interview whenever he chose to do so.  In fact, Leonard did ultimately choose to end the interview.

Gray contends that the interviewing officers "employ[ed] a series of promises, threats and deception" to overcome Leonard's free will.  Doc. 44 at 2.  But none of Gray's examples show coercion sufficient to overcome Leonard's will.

Agent Butler's offer to share Leonard's cooperation with the relevant authorities was not improper.  *See United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (noting that "police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence").

Agent Butler said Leonard could help his brother – who was already implicated in the murder by being found driving the victim's car – by speaking with Butler.  This was a true statement and was not improperly coercive.  *See United States v. Goldtooth*, --- F. Supp. 3d ---, No. CR-14-08073-PCT-DGC, 2015 WL 3657587, at *3-4 (D. Ariz. June 12, 2015) (not every reference to a suspect's family during interrogation renders a subsequent confession involuntary).

Agent Butler spent time at the beginning of the interview reviewing the evidence he had collected regarding the murder of T.S.  He made clear that he thought Leonard was involved, and he mentioned a 20-year sentence Leonard could receive for a kidnapping charge alone.  Although these statements undoubtedly created some pressure on Leonard, the Court does not find that they alone overbore his will and rendered the

interview involuntary. Courts have recognized that presenting evidence of guilt during custodial interrogations is not, standing alone, unduly coercive. *See, e.g., United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) ("That the troopers showed Mr. Toro the cocaine and pointed out the possible consequences if convicted in an effort to elicit cooperation does not compel a finding of coercion."); *Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir. 1989) ("An interrogating officer's act of merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct." (citation omitted)).

Agent Butler's other statements – that this was Leonard's opportunity to help himself by talking, that Butler would look into the murder of Leonard's brother (which Agent Butler testified was a true statement), and that the government's case against Leonard was strong and included DNA and fingerprint evidence – do not lead the Court to conclude that Leonard's will was overborn. Considering the totality of the circumstances, including Leonard's education, the physical surroundings of the interview, the time of day and length of the interview, the calm nature of the conversation, and the fact that Leonard ultimately elected to terminate the interview, the Court finds by a preponderance of the evidence that Leonard's statements were voluntary and his will was not overborne. The Court therefore cannot conclude that use of Leonard's statement at trial would violate Gray's right to due process.

### C.     Conclusion.

It may at first glance seem odd that the same confession can be deemed a violation of Leonard's *Miranda* rights and inadmissible against Leonard, and yet be deemed voluntary and admissible against Gray. But the inquiries for the two Defendants are very different. *Miranda* establishes a prophylactic rule designed to protect sensitive constitutional rights. Its violation results in suppression of a confession without any showing that the confession was involuntary. Thus, a confession may be voluntary and yet be taken in violation of *Miranda.*

Gray's due process claim, by contrast, turns entirely on whether the confession

was involuntary.  It is the coerced nature of a confession and its resulting unreliability that can violate Gray's due process rights.

In this case, the Court finds that Leonard's confession, although voluntary, was taken in violation of his right to counsel.  The confession therefore cannot be used against Leonard, but it may be used against Gray.  The implications of this ruling on a joint trial of the Defendants are for another day.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 10/5/2015 for Defendant Gray and 10/23/2015 for Defendant Leonard.

**IT IS ORDERED:**

1.     Defendant Leonard's motion to suppress (Doc. 52) is **granted**.

2.     Defendant Gray's motion to suppress (Doc. 44) is **denied**.

Dated this 10th day of December, 2015.

David G. Campbell
United States District Judge