**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-15-08076-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Kyle Filbert Gray (001)<br>Devan Edward Leonard (002), | |
| Defendants. | |

Defendants Kyle Gray and Devan Leonard, along with others, are charged in a Second Superseding Indictment with conspiracy and other offenses under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* Doc. 131. Gray has filed a motion to dismiss Counts 9 and 10 (Doc. 225); a motion to suppress cell-site location information and derivative cell phone expert testimony (Doc. 229); a motion to dismiss the indictment's notice of enhanced sentencing, or, in the alternative, for a bill of particulars (Doc. 234); a motion to dismiss Count 1, or, in the alternative, to strike state racketeering predicates (Doc. 242); a motion to sever trial on Count 12 (Doc. 243); and a motion to dismiss Count 1 as unconstitutional (Doc. 248). Leonard has moved to suppress physical evidence. Doc. 236. Leonard has also joined Gray's motion to dismiss Counts 9 and 10 (Doc. 237); motion to dismiss the indictment's notice of enhanced sentencing (Doc. 238); motion to suppress cell-site location information (Doc. 239); and

motion to dismiss Count 1, or, in the alternative, to strike state racketeering predicates (Doc. 245). The motions are fully briefed, and the Court held an evidentiary hearing and heard oral argument on August 18, 2017. For the reasons stated below, the Court will deny Defendants' motions.

## I.        Background.

The Second Superseding Indictment brings charges against Defendants Gray and Leonard, and also against Randall Franklin Begay, Lucille Jean Leonard, and Uriah Thomas Shay, each of whom is alleged to be an enrolled member of the Navajo Nation, a federally recognized tribe. Doc. 131. Count 1 alleges that all Defendants participated in a RICO conspiracy through their association with the Red Skin Kingz ("RSK"), an allegedly violent street gang. *Id.* The indictment's 18 remaining counts charge that Gray, Leonard,[1] and Begay committed various criminal acts while associated with the RICO conspiracy. *Id.* A jury trial is scheduled for January 23, 2018. Doc. 177.

## II.       Motion to Dismiss Counts 9 and 10 (Doc. 225).

Count 9 alleges that Gray and Leonard violated 18 U.S.C. § 924(j) when they committed the second-degree murder of T.S. as charged in Count 8. Doc. 131 at 17. Section 924(j) applies when a defendant causes death in the course of violating 18 U.S.C. § 924(c), which in turn applies when a firearm is used in a "crime of violence." Count 10 alleges that Gray and Leonard directly violated 18 U.S.C. § 924(c) – specifically § 924(c)(1)(A)(iii) – by knowingly using, carrying, and discharging a firearm during the "crime of violence" charged in Count 8. *Id.* Thus, Counts 9 and 10 each depend upon the second-degree murder charged in Count 8 being a "crime of violence."

"Crime of violence" is defined in § 924(c)(3):

> For purposes of this subsection the term "crime of violence" means an offense that is a felony and—

---

[1] For the purposes of this Order, "Leonard" refers to Devan Edward Leonard, not Lucille Jean Leonard. Defendant Lucille Jean Leonard is not party to any of the motions addressed in this order.

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Part (A) of this definition is commonly referred to as the "force clause.'" Part (B) is known as the "residual clause."

Defendants argue that the second-degree murder charged in Count 8 – an alleged violation of 18 U.S.C. § 1111 – is not a crime of violence within either clause of this definition, and therefore cannot form the basis for the charges in Counts 9 and 10. They ask the Court to dismiss those counts.

## A. Force Clause.

To determine whether a crime qualifies as a crime of violence, courts in the Ninth Circuit use a categorical approach. *See United States v. Calvillo-Palacios*, 860 F.3d 1285, 1288 (9th Cir. 2017). In this case, the categorical approach requires the Court to decide whether the full range of conduct proscribed by the second-degree murder statute can be categorized as a crime of violence. If some conduct covered by the statute does not fit the definition of a crime of violence, then conviction under the statute is not for a crime of violence.

## 1. Can a Crime of Violence Be Committed Recklessly?

Defendants cite *Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121 (9th Cir. 2006) (en banc), for the proposition that a crime of violence "must involve the *intentional* use of force against the person or property of another." *Id.* at 1132 (emphasis added); Doc. 225 at 7-8. Because one can commit second-degree murder with a *mens rea* of recklessness, Defendants argue that the crime can be committed without an intentional use of force and therefore is not a categorical crime of violence. Doc. 225 at 10-11.

Before the decision in *Fernandez-Ruiz*, it was "well established in this circuit that crimes involving the reckless use of force could be crimes of violence[,]" based on the

conclusion that "recklessness 'requires conscious disregard of a risk of a harm that the defendant is aware of.'" *Fernandez-Ruiz*, 466 F.3d at 1126 (quoting *United States v. Trinidad-Aquino*, 259 F.3d 1140, 1146 (9th Cir. 2001)). But after the Supreme Court's decision in *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Ninth Circuit reversed direction in *Fernandez-Ruiz*. 466 F.3d at 1127-29. In *Leocal*, the Supreme Court held that the negligent or accidental use of force is not a crime of violence. *Leocal*, 543 U.S. at 11-12. Although *Fernandez-Ruiz* recognized that *Leocal* reserved the question of whether the reckless use of force is a crime of violence, 466 F.3d at 1127, the Ninth Circuit concurred with decisions from the Third and Fourth Circuits that the "reasoning of *Leocal . . .* extends to crimes involving the reckless use of force." *Id.* at 1127-29 (citing *Oyebanji v. Gonzales*, 418 F.3d 260 (3d Cir. 2005); *Popal v. Gonzales*, 416 F.3d 249 (3d Cir. 2005); *Tran v. Gonzales*, 414 F.3d 464 (3d Cir. 2005); *Bejarano-Urrutia v. Gonzales*, 413 F.3d 444 (4th Cir. 2005)).

The Ninth Circuit found the Third Circuit's opinion in *Oyebanji* particularly persuasive. *Id.* at 1129. *Oyebanji* addressed a conviction for vehicular homicide under New Jersey law. *Id.* *Oyebanji* concluded that "even though New Jersey's definition of recklessness involved conscious disregard of a substantial and unjustifiable risk, the reckless use of force was not sufficiently 'intentional' to prevent an offense from being accidental." *Id.* Applying this reasoning, the Ninth Circuit in *Fernandez-Ruiz* held that the petitioner's misdemeanor domestic violence conviction was not a categorical crime of violence under 18 U.S.C. § 16(a). *Id.* at 1132. The Ninth Circuit held that "[i]n light of *Leocal*, we expressly overrule our cases holding that crimes of violence under 18 U.S.C. § 16 may include offenses committed through the reckless, or grossly negligent, use of force." *Id.*

Cases decided after *Fernandez-Ruiz* have restated its position on crimes of violence. *See Covarrubias Teposte v. Holder*, 632 F.3d 1049, 1053 (9th Cir. 2011) ("The effect of our holdings is that in order to be a predicate offense under either 18 U.S.C. § 16 approach, the underlying offense must require proof of an *intentional* use of force or a

- 4 -

substantial risk that force will be *intentionally* used during its commission." (citation omitted; emphasis in original)); *see also United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015) (considering whether robbery was a "violent felony" for purposes of 18 U.S.C. § 924(e)(2)(B), the Ninth Circuit interpreted *Leocal* to require the use of force to be "intentional, not just reckless or negligent").  The Ninth Circuit has also acknowledged, however, that the reasoning of *Fernandez-Ruiz* now rests on shaky ground.  Following the Supreme Court's decision in *Voisine v. United States*, 136 S.Ct. 2272 (2016), the Ninth Circuit acknowledged that *Voisine* suggests that "reckless conduct indeed can constitute a crime of violence."  *United States v. Benally*, 843 F.3d 350, 354 (9th Cir. 2016) (citing *Voisine*, 136 S.Ct. at 2279-80).

Whatever the eventual outcome of this ongoing issue, the Court concludes that Counts 9 and 10 are not controlled by *Fernandez-Ruiz* because second-degree murder under 18 U.S.C. § 1111 cannot be based on mere recklessness.  A conviction under § 1111 requires, at the least, that a defendant act "recklessly *with extreme disregard for human life*."  *See* Model Criminal Jury Instruction 8.108 (9th Cir. June 2017) (emphasis added).  This higher standard of recklessness "require[s] a finding of extreme recklessness evincing disregard for human life, not simple recklessness."  *United States v. Pineda-Doval*, 614 F.3d 1019, 1040 (9th Cir. 2010); *see also United States v. Wilson*, 221 F. App'x 551, 553 (9th Cir. 2007) (unpublished) (noting distinction "between mere recklessness and recklessness with extreme disregard for human life"); *United States v. Lesina*, 833 F.2d 156, 159 (9th Cir. 1987) ("disregard for human life becomes more callous, wanton or reckless, and more probative of malice aforethought, as it approaches a mental state comparable to deliberation and intent"); *United States v. Celestine*, 510 F.2d 457, 459 (9th Cir. 1975) ("Malice aforethought . . . embraces the state of mind with which one intentionally commits a wrongful act without legal justification or excuse.  It may be inferred from circumstances which show 'a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences.'" (citation omitted)).  This

heightened standard differs from the mere recklessness found incapable of supporting a crime of violence in *Fernandez-Ruiz*.

What is more, the Ninth Circuit has not applied the rule of *Fernandez-Ruiz* to second-degree murder. Since *Fernandez-Ruiz* was decided in 2006, the Ninth Circuit has held that second-degree murder is a crime of violence. *See*, *e.g.*, *United States v. J.J.*, 704 F.3d 1219, 1222 (9th Cir. 2013) ("In this case, there is no question that . . . second-degree murder, if committed by an adult, would be a felony crime of violence."); *United States v. Begay*, 567 F.3d 540, 552 (9th Cir. 2009), *overruled on other grounds*, 673 F.3d 1038 (9th Cir. 2011) ("Both first- and second-degree murder constitute crimes of violence."). The Ninth Circuit has also upheld convictions for second-degree murder under § 1111 and corresponding convictions under § 924(c)(1)(A). *See Wilson*, 221 F. App'x at 552; *United States v. Houser*, 130 F.3d 867, 868 (9th Cir. 1997); *United States v. Andrews*, 75 F.3d 552, 553 (9th Cir. 1996).

In light of the Ninth Circuit's holding that second-degree murder is a crime of violence, and the fact that the Court of Appeals has not applied *Fernandez-Ruiz* to second-degree murder, the Court cannot accept Defendants' argument. Second-degree murder is a crime of violence for the purposes of § 924(c).

### 2. Use of Physical Force.

Defendants also contend that second-degree murder is not a crime of violence because it can be committed without physical force. Specifically, Defendants rely on *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), and similar cases to claim that a crime of violence must include the use or threatened use of force, not simply actions that result in death. Doc. 225 at 11-13. Defendants contend "the unlawful killing of another could be accomplished in many ways that would not require force, such as: leaving someone in a large body of water to drown; starving a child or vulnerable adult; infecting someone with a deadly virus; or setting someone on fire." *Id.* at 12. For three reasons, the Court does not agree.

First, after *Torres-Miguel* was decided by the Fourth Circuit, the Supreme Court held that "physical force" can be direct or indirect. *United States v. Castleman*, 134 S.Ct. 1405, 1414-15 (2014). The Supreme Court explained that poisoning constitutes a use of force because the perpetrator "employ[s] poison knowingly as a device to cause physical harm." *Id.* at 1415. Each of Defendants' examples – using water to cause drowning, withholding food to cause starvation, infecting with a virus to cause death, and using fire to cause death – also employs a device to cause physical harm.

In light of *Castleman*, the Fourth Circuit recognized that *Torres-Miguel* – the case on which Defendants rely – was no longer good law. *See United States v. Burns-Johnson*, 864 F.3d 313, 318 (4th Cir. 2017) (acknowledging that *Castleman* abrogates *Torres-Miguel*'s finding that the use of poison would not constitute the use of physical force); *United States v. Reid*, 861 F.3d 523, 529 (4th Cir. 2017) ("by applying the combination of *Johnson* and *Castleman*, we conclude that ACCA's phrase 'use of physical force' includes force applied directly or indirectly"). *Torres-Miguel*'s reasoning "can no longer support an argument that the phrase 'use of physical force' excludes indirect applications." *Id.*

The Fourth Circuit also held that second-degree murder "is a crime of violence under the force clause because unlawfully killing another human being requires the use of force 'capable of causing physical pain or injury to another person.'" *In re Irby*, 858 F.3d 231, 236 (4th Cir. 2017). "Common sense dictates that murder is categorically a crime of violence under the force clause." *Id.* at 237. Defendants' appeal to Fourth Circuit case law, therefore, does not help their motion.

Second, the Ninth Circuit has rejected the rationale in *Torres-Miguel*. In *United States v. Calvillo-Palacios*, 860 F.3d 1285 (9th Cir. 2017), and *Hernandez v. Lynch*, 831 F.3d 1127 (9th Cir. 2016), the Ninth Circuit expressly rejected the *Torres-Miguel* line of cases as inconsistent with the Supreme Court's decision in *Castleman*. *See Calvillo-Palacios*, 860 F.3d at 1290-91; *Hernandez*, 831 F.3d at 1131. In doing so, the Ninth

Circuit cited and impliedly rejected each of the cases on which Defendants rely to support their argument. *Calvillo-Palacios*, 860 F.3d at 1290-91; *Hernandez*, 831 F.3d at 1131.

Third, as already noted, the Ninth Circuit has held that second-degree murder constitutes a crime of violence. *See, e.g., J.J.*, 704 F.3d at 1222; *Begay*, 567 F.3d at 552.

For these reasons, the Court rejects Defendants' argument that second-degree murder is not a crime of violence for the purposes of § 924(c)(3)(A) because it could be committed without using physical force.

**B.    Residual Clause.**

Relying on the Supreme Court's holding in *Johnson v. United States*, 135 S.Ct. 2551 (2015), Defendants argue that the residual clause is unconstitutionally vague. Doc. 225 at 4. At oral argument, the government stated that if Counts 9 and 10 can proceed under the force clause of § 924(c)(3)(A) – which the Court does, for reasons explained above – the government will not rely on the residual clause of § 924(c)(3)(B) at trial. The Court therefore need not decide whether the residual clause is constitutional.

**III.    Cell-Site Location Information and Expert Testimony (Doc. 229).**

Defendant Gray, joined by Defendant Leonard, argues that the Court must suppress cell-site location information ("CSLI") and derivative cell phone expert testimony. Docs. 229, 239. On October 27, 2015, the government filed two sealed applications for orders, pursuant to 18 U.S.C. § 2703(d), that Cellular One turn over records associated with two telephones allegedly used by Gray and Leonard. Docs. 229 at 2, 251 at 2. On the same day, a United States Magistrate Judge issued the orders and found "reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation." Doc. 251 at 2. Using these orders, the FBI obtained and analyzed subscriber information, call detail records, and CSLI associated with the two telephones for the time period of January 1, 2014, to April 30, 2015. Docs. 229 at 2, 251 at 3. This analysis included focused efforts to determine the location and movements of Defendants on the night of the alleged murder of T.S. Doc. 229 at 3-4. Defendants argue that the government's collection and analysis

of the CSLI constituted a "search" within the meaning of the Fourth Amendment, and that a warrant supported by probable cause was therefore required. Doc. 229 at 4-7.

Section 2703(d) does not require a finding of probable cause, only a lesser finding of "reasonable grounds to believe that . . . the records or other information sought[] are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Defendants argue that the Fourth Amendment requires more and that the government's collection and analysis of the CSLI was illegal. Doc. 229 at 4-7.

The government notes that neither the Supreme Court nor the Ninth Circuit have addressed this issue, but argues that the vast majority of federal courts have found that the collection of CSLI pursuant to 18 U.S.C. § 2703(d) is not a search under the Fourth Amendment. Doc. 251 at 4-5. The government also contends that the "third-party doctrine" deprives Defendants of any privacy interest in the records. Doc. 251 at 4.

To invoke the protections of the Fourth Amendment, a defendant must have a legitimate expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The "legitimate expectation of privacy" inquiry has two components. *See Smith v. Maryland*, 442 U.S. 735, 740-41 (1979); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007). First, the court must consider whether the defendant has exhibited an actual, subjective expectation of privacy. *Smith*, 442 U.S. at 740. Second, the court must determine whether the defendant's subjective expectation of privacy is "one that society is prepared to recognize as reasonable." *Id.* at 740-41 (internal quotation marks and citation omitted). A defendant bears the burden of showing a reasonable expectation of privacy. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citing *Rakas*, 439 U.S. at 131); *see United States v. Johnson*, 584 F.3d 995, 998 (10th Cir. 2009). Whether a defendant's expectation of privacy is objectively reasonable is a question of law. *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).

In *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979), the Supreme Court recognized the "third-party doctrine." That doctrine

holds that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743-44; *see also Miller*, 425 U.S. at 442-44. In *Miller*, the Supreme Court found that a bank customer had no reasonable expectation of privacy in financial information he voluntarily conveyed to his bank for use in the ordinary course of its business. *Id.* at 442-43. In *Smith*, the Supreme Court held that the defendant did not have a reasonable expectation of privacy in numbers he dialed from his telephone because he voluntarily conveyed that information to the telephone company. 442 U.S. at 742-45.

Contrary to Defendants' arguments, federal courts consistently rely on *Miller* and *Smith* to hold that defendants have no reasonable expectation of privacy in historical cell-site data because the defendants voluntarily convey their location information to the cell phone company when they use a cell phone and transmit their signal to a nearby cell tower, and because the companies maintain that information in the ordinary course of business. *See United States v. Thompson*, --- F.3d ---, No. 15-3313, 2017 WL 3389368, at *9 (10th Cir. Aug. 8, 2017); *United States v. Stimler*, 864 F.3d 253, 264 n.33 (3d Cir. 2017); *United States v. Graham*, 824 F.3d 421, 427-28 (4th Cir. 2016) (en banc); *United States v. Carpenter*, 819 F.3d 880, 887-90 (6th Cir. 2016), *cert. granted*, 137 S.Ct. 2211 (2017); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (en banc); *In re Application of United States for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013); *United States v. Ruby*, No. 12CR1073 WQH, 2013 WL 544888, at *6 (S.D. Cal. Feb. 12, 2013); *United States v. Madison*, No. 11–60285–CR, 2012 WL 3095357, at *7-9 (S.D. Fla. July 30, 2012); *United States v. Graham*, 846 F. Supp. 2d 384, 397-403 (D. Md. 2012). The government emphasizes that "every Circuit that has considered this issue has rejected the defendants' argument and concluded the United States may obtain historical cell-site information via a 2703(d) order." Doc. 251 at 4.

Defendants rely heavily on Judge Koh's thoughtful opinion in *In re Application for Telephone Info. Needed for a Criminal Investigation*, 119 F. Supp. 3d 1011 (N.D. Cal. 2015). But that decision admittedly is in a small minority of district court cases that have

found collection of CSLI subject to a probable cause requirement, and the Court finds the reasoning of the Fourth Circuit in *Graham*, 824 F.3d at 426-38, and the Sixth Circuit in *Carpenter*, 819 F.3d at 886-91, to be more persuasive on this issue.[2]

The Court concludes that the third-party doctrine applies to the CSLI obtained by the FBI pursuant to the § 2703(d) orders. Defendants had no reasonable expectation of privacy in data they voluntarily conveyed to Cellular One, and probable cause was not required.

Even if the Court were to conclude that a Fourth Amendment violation occurred in this case, Defendants' motion would be denied. The fact that a Fourth Amendment violation occurs "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). One of the "important principles that constrain[s] application of the exclusionary rule" is the good faith exception. *Id.* at 140. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that when an officer acts "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment," evidence should not be suppressed. *Id.* at 918-22. The good faith exception applies where law enforcement officers reasonably rely on a search warrant issued by a neutral magistrate, *id.* at 920-21, on a statute later held unconstitutional, *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987), or on binding appellate precedent later overruled, *Davis v. United States*, 564 U.S. 229, 241 (2011).

When the FBI obtained the CSLI in this case, they followed the procedures required by § 2703(d) and obtained the approval of a United States Magistrate Judge. The vast majority of federal cases, including cases in this district, *see United States v. Rigmaiden*, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *9-14 (D. Ariz. May 8, 2013), have held those statutory procedures constitutional. Law enforcement relied in good faith on the validity of the law they were following. The Court cannot agree with Defendants' argument that the good faith exception would not apply because two judges

---

[2] The Supreme Court has granted a writ of certiorari in *Carpenter*, 137 S.Ct. 2211 (2017), but a decision is not likely for six or more months.

1   in the Northern District of California had adopted a clearly minority view of the validity

2   of § 2703(d).  Thus, even if the Court were to conclude that obtaining CSLI is a Fourth

3   Amendment search that requires a finding of probable cause, the Court would deny

4   Defendants' motion to exclude the CSLI and related expert testimony.

5   **IV.  Notice of Enhanced Sentencing and Bill of Particulars (Doc. 234).**

6           In the Second Superseding Indictment, the government provides notice of its intent

7   to seek life imprisonment of Gray and Leonard for the RICO conspiracy alleged in

8   Count 1.  Doc. 131 at 15.  This notice is based on 18 U.S.C. § 1963(a), which provides:

9   "Whoever violates any provision of section 1962 of this chapter shall be fined under this

10  title or imprisoned not more than 20 years (*or for life if the violation is based on a*

11  *racketeering activity for which the maximum penalty includes life imprisonment*)."

12  (Emphasis added).  The notice alleges that Defendants Gray, Leonard, and Begay:

> joined and remained in the RICO conspiracy charged in Count One
> knowing and agreeing that members of the enterprise would engage in acts
> involving murder, in violation of Arizona Revised Statutes Section[] . . .
> 13-1105 [the Arizona first-degree murder statute], to wit: intentionally
> causing the death of another person and knowingly causing the death of
> another with premeditation.

18  Doc. 131 at 15, ¶ 22.[3]

19          Because the indictment presents no separate count alleging first-degree murder

20  against any defendant, Gray, joined by Leonard, makes two arguments in support of

21  striking the notice of enhanced sentencing.  Docs. 234, 238.  First, Defendants note that

22  the indictment does not include the charge of first-degree murder against anyone, and

23  argue that such a charge cannot be included in this case under the notice of enhanced

24  sentencing because it has not been found by the grand jury.  *Id.* at 7-8.  Second,

---

26          [3] The notice also included citations to other Arizona statutes, including A.R.S.
27  §§ 13-1104, 13-1001, 13-1003, and 13-1004.  Defendant Gray noted that none of these
    crimes carries a maximum penalty of life in prison, and none can form the basis for an
28  enhanced sentence under 18 U.S.C. § 1963(a).  The government agreed, and moved at the
    hearing to strike these allegations from the indictment.  *See* Doc. 262 at 3.  The Court
    granted the motion.

Defendants contend that the Sixth Amendment requires that an indictment have sufficient factual detail to put them on notice of the specific charges against them. *Id.* at 9. Because the indictment presents no separate count for first-degree murder and does not otherwise allege the facts constituting premeditation as required for first-degree murder, Defendants argue that it fails to put them on notice of the facts the government intends to prove to secure an enhanced sentence. *Id.* at 7-9.

### A.    Grand Jury Presentment.

The crime for which enhanced sentencing is sought is the RICO conspiracy charged in Count 1. The indictment sets forth 13 pages of detailed factual allegations regarding that conspiracy. Doc. 131 at 2-15. With respect to the sentencing enhancement, the indictment alleges that Defendants Gray, Leonard, and Begay joined and remained in the conspiracy knowing and agreeing that members of the enterprise – RSK – would engage in acts involving murder, including violation of Arizona's first-degree murder statute (A.R.S. § 13-1105), "with premeditation." *Id.* at 15, ¶ 22. These allegations include all of the elements of RICO conspiracy and all of the elements needed for the sentencing enhancement. *See* 18 U.S.C. § 1963(a). The indictment also specifically cites the Arizona statute for first-degree murder, A.R.S. § 13-1105. Doc. 131 at 15, ¶ 22. That statute makes clear that a life sentence is available for its violation, § 13-1105(D), and that premeditation is required, § 13-1105(A)(1). And the indictment specifically alleges that Defendants knew and agreed the crime would be committed by members of RSK "with premeditation." Doc. 131 at 15, ¶ 22. Given that the indictment fully sets forth the elements of RICO conspiracy and the sentencing enhancement, the Court cannot agree with Defendants' assertion that the grand jury did not find probable cause for each of these elements.

### B.    Notice to Defendants.

The Sixth Amendment preserves a defendant's right "to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the

offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it contains 'the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy.'" *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (quoting *United States v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995)). "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" *Id.* (quoting *United States v. Hinton*, 222 F.3d 664, 672 (9th Cir. 2000)).

The Court concludes that this test has been satisfied. All of the elements of RICO conspiracy have been pled in Count 1, as have the requirements for the life sentence enhancement. The allegations in Count 1 inform Defendants of the charge against them and are sufficiently detailed to allow a later plea of double jeopardy.

Under Rule 7(f), the Court may direct the government to file a bill of particulars if Defendant moves for one within 14 days after arraignment or if the Court later allows the motion. Fed. R. Crim. P. 7(f). Typically, "[a] motion for a bill of particulars is appropriate where a defendant requires clarification in order to prepare a defense." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983). Such an order is not appropriate, however, if an indictment "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and enables the Defendant to plead acquittal or conviction. *United States v. Chenaur*, 552 F.2d 294, 301 (9th Cir. 1977). While statutory language in an indictment "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense]," *id*., a "defendant is not entitled to know all the *evidence* the government intends to produce[,] but only the *theory* of the government's case," *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986) (emphasis in original).

The Court concludes that a bill of particulars is not required in this case. The government explained in their response to Defendants' motion and at the August 18 hearing that the allegations of premeditated first-degree murder are found in paragraphs 20 and 27-29 of the overt acts listed in Count 1. Doc. 131 at 11-12, ¶¶ 20, 27-29. Those

paragraphs identify the murders of D.C. and R.H. on December 12-13, 2014, and the murder of T.S. on December 16, 2014. *Id.* In addition to providing dates, those paragraphs identify the general locations of the murders and provide some facts regarding them, including that Leonard taunted R.H. and displayed gang signs before shooting him in the face and that Gray and Leonard shot and killed T.S. after a methamphetamine transaction at a picnic area near Wheatfields Lake. *Id.* Defendants may not agree that these alleged killings constitute premeditated first-degree murder under A.R.S. § 13-1105, but they now know the factual basis for the government's allegation that they conspired to commit premeditated murder, and can prepare their defense accordingly. The Court will hold the government to these disclosures and will not permit it to identify other crimes at trial that support the life sentence enhancement alleged in the indictment.

**V.      Motion to Dismiss Count 1 or Strike Racketeering Predicates (Doc. 242).**

To convict Defendants of the conspiracy charge in Count 1, the government must prove they conspired to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c)-(d). A "'pattern of racketeering activity' requires at least two acts of racketeering activity." *Id.* § 1961(5). "Racketeering activity" is defined to include murder and other crimes "chargeable under State law and punishable by imprisonment for more than one year." *Id.* § 1961(1). Gray, joined by Leonard, argues that the Court must dismiss Count 1 because its state-law racketeering activities are not "chargeable under State law." Docs. 242 at 8-9, 245.

Count 1 includes the predicate offenses of murder, robbery, arson, and kidnapping in violation of specific Arizona statutory provisions. Doc. 131 at 6. Because Arizona and its laws have no criminal jurisdiction over the Navajo reservation, Defendants contend that these state-law predicates are not "chargeable under State law," thus disqualifying them as racketeering activities. Doc. 242 at 8-9. Because the state-law predicates are "commingled" with federal predicates in the same list of racketeering activities, Defendants argue that the Court must strike all racketeering predicates and

dismiss Count 1.  Doc. 242 at 12-13.  The government responds that § 1961(1)'s list of acts "chargeable under State law" is merely definitional, and the state-law predicates are appropriate even if Arizona could not actually charge Defendants with the predicate offenses in state court.  Doc. 265 at 7-12.

The parties do not cite any Ninth Circuit case that has addressed this issue, and the Court has found none.  But cases from other circuits and analogous cases from the Ninth Circuit lead the Court to conclude that the state-law predicates in this case fall within the definition of "racketeering activities" in § 1961(1).

This is an issue of statutory interpretation.  The parties spend much time briefing the respective jurisdictional powers of the federal, state, and tribal governments, but this is not a question of jurisdiction.  The parties agree that RICO violations can be prosecuted in federal court against Indians for conduct occurring on Indian reservations.  Docs. 242 at 11, 265 at 6.  The parties also agree that the State of Arizona cannot prosecute Indians for state crimes committed on reservations.  Docs. 242 at 8, 265 at 5-6.  These jurisdictional boundaries are not in dispute.  The issue here is the meaning of § 1961(1)'s definition of "racketeering activity" to include various crimes "*which [are] chargeable under State law* and punishable by imprisonment for more than one year." (Emphasis added).  Does this language include an act of murder that would be "chargeable under State law" if committed by a person and in an area subject to the State's jurisdiction, or is it limited to a murder that could actually be charged by the State of Arizona?  Defendants contend that the latter definition is correct and that the state-law crimes included in Count 1 do not fall within that definition.

The Court begins by looking to the language and structure of the statute.  RICO generally makes it a federal crime for persons to conduct an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(a)-(c).  RICO also makes it a crime to conspire to operate an enterprise through a pattern of racketeering activity.  *Id.* § 1962(d). This is a federal crime, established by federal statute, chargeable in federal court.  As a federal criminal law of general application, it applies fully on Indian reservations.  *United*

*States v. Anderson*, 391 F.3d 1083, 1085-86 (9th Cir. 2004) ("We have frequently said that federal criminal laws of nationwide applicability apply to Indians within Indian country just as they apply elsewhere.").

Section 1961 defines relevant terms. Section 1961(5) defines "pattern of racketeering activity" as "at least two acts of racketeering activity." Section 1961(1) defines "racketeering activity," and does so broadly. It includes seven categories of crimes, six of which include a very long list of enumerated federal crimes. These six categories cite more than 80 specific sections of the federal criminal code, covering crimes as diverse as bribery, counterfeiting, embezzlement, immigration fraud, witness tampering, economic espionage, money laundering, slave trade, drugs, and trafficking in nuclear materials. 18 U.S.C. § 1961(1)(B)-(G). It is evident from this list that Congress intended to cast the RICO net very broadly, capturing the operation of any enterprise through patterns of committing a wide range of crimes.

The seventh category of crimes included in § 1961(1) is found at the beginning of the section, a location that suggests it was important to Congress. It reads as follows:

> (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year.

*Id.* § 1961(1)(A).

Consistent with the rest of § 1961(1), this language defines "racketeering activity" broadly. It includes "any act" involving several categories of crimes "chargeable under State law," and "any . . . threat" involving such crimes. The definition does not say that a defendant must be charged with the state crime, nor that the defendant must be found guilty of the state crime. The statute applies to acts or threats to act, and describes the acts by stating that they must be chargeable under state law. The reference to these state crimes clearly is definitional, defining the conduct that constitutes "racketeering activity" for purposes of a RICO prosecution.

The Court cannot conclude that Congress intended to limit the acts identified in § 1961(1)(A) to crimes that state authorities could actually charge and prosecute in state court. Congress was identifying racketeering acts for purposes of a federal criminal statute designed to punish violent, fraudulent, and manipulative criminal syndicates. Given its breadth, the unmistakable intent of § 1961(1) was to include a wide range of conduct that could be particularly destructive when made a pattern or practice of a criminal enterprise. In addition to exhaustively listing federal crimes, Congress identified many serious state crimes – "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical." *Id.* § 1961(1)(A). In light of the clear intent to define racketeering activities expansively, the Court concludes that Congress wanted to include *types* of criminal conduct often charged in state court – conduct that would be common tools of the criminal syndicates it was targeting. Congress fully understood that this general federal criminal statute would apply in locations where state law does not apply. The Court can see no reason Congress would have excluded acts of murder, kidnapping, or arson simply because they could not actually be prosecuted in state court. An inability to prosecute in state court could arise for any number of reasons: statutes of limitations, double jeopardy, or jurisdictional limits – limitations not lost on Congress. The intent was to define racketeering activity to be prosecuted in federal court. Given the intentionally broad reach of RICO as reflected in § 1961(1), it would have made little sense to tie that definition to the limitations of state court.

Various cases support this conclusion, and the Court has found none that suggests the narrower construction proposed by Defendants.

The Third and Sixth Circuits have held that state-law predicates are racketeering activities under § 1961 even if they cannot be charged in state court. In *United States v. Forsythe*, 560 F.2d 1127 (3d Cir. 1977), the Third Circuit considered whether a state-law crime could serve as a predicate racketeering act where the state statute of limitations had expired. *Id.* at 1134. The court provided this helpful explanation:

RICO is a federal law proscribing various racketeering acts which have an effect on interstate or foreign commerce. Certain of those racketeering, or predicate acts violate state law and RICO incorporates the elements of those state offenses for definitional purposes. State law offenses are not the gravamen of RICO offenses. RICO was not designed to punish state law violations; it was designed to punish the impact on commerce caused by conduct which meets the statute's definition of racketeering activity. To interpret state law offenses to have more than a definitional purpose would be contrary to the legislative intent of Congress and existing state law.

*Id.* at 1135 (footnote omitted); *see also United States v. Frumento*, 563 F.2d 1083, 1087 n.8A (3rd Cir. 1977) ("Section 1961 requires, in our view, only that the conduct on which the federal charge is based be typical of the serious crime dealt with by the state statute, not that the particular defendant be 'chargeable under State law' at the time of the federal indictment.").

Similarly, in *United States v. Licavoli*, 725 F.2d 1040 (6th Cir. 1984), the Sixth Circuit considered whether a prior acquittal in state court of a state-law crime barred the use of the same crime as a predicate racketeering activity in a federal RICO prosecution. *Id.* at 1047. The Court held that it did not. *Id.* This was the reasoning:

[RICO] forbids "racketeering," not state offenses per se. The state offenses referred to in the federal act are definitional only; racketeering, the federal crime, is defined as a matter of legislative draftsmanship by a reference to state law crimes. This is not to say . . . that the federal statute punishes the same conduct as that reached by state law. The gravamen of section 1962 is a violation of federal law and "reference to state law is necessary only to identify the type of unlawful activity in which the defendant intended to engage." *United States v. Cerone*, 452 F.2d 274, 286 (7th Cir. 1971). (Footnote omitted.)

*Id.* (quoting *Frumento*, 563 F.2d at 1087).

The Ninth Circuit used similar reasoning in an analogous case. In *United States v. Thomas*, 887 F.2d 1341 (9th Cir. 1989), the Ninth Circuit considered whether a state-law crime barred by a state statute of limitations could serve as a predicate offense for a Lacey Act violation. *Id.* at 1348. Citing *Forsythe* and *Licavoli*, the Ninth Circuit held that the Lacey Act's references to state-law violations were only for federal definitional

purposes, and the state statute of limitations did not impede the use of the state crimes as predicate offenses.  *Id.* at 1349.

Likewise, in the tribal context, the Ninth Circuit held that a lack of state-court jurisdiction did not preclude the use of a state-law crime as a predicate offense under a federal gambling statute.  In *United States v. Farris*, 624 F.2d 890 (9th Cir. 1980), the Ninth Circuit considered whether a Washington gambling law could serve as the predicate "violation of State law" under 18 U.S.C. § 1955.  *Id.* at 894, *superseded on other grounds by statute as recognized in United States v. E.C. Investments, Inc.*, 77 F.3d 327 (9th Cir. 1997).  Acknowledging that Washington lacked jurisdiction to enforce its gambling laws against the Indian defendants, the Ninth Circuit nonetheless found that the state-law crime could serve as a predicate for the federal offense.  *Id.* at 895-96.

In another reservation case, *United States v. E.C. Investments, Inc.*, 77 F.3d 327 (9th Cir. 1997), the Ninth Circuit held that a state-law gambling crime could serve as a predicate offense under § 1955 despite the fact that the state lacked jurisdiction to prosecute the offense in state court.  *Id.* at 330-31.  The court emphasized that holding otherwise would immunize the targeted conduct from prosecution on reservations, a result that was "unsupportable."  *Id.* at 331.

Defendants' reliance on *United States v. Fiander*, 547 F.3d 1036 (9th Cir. 2008), is misplaced.  Unlike this case, the *Fiander* court considered an alleged RICO conspiracy involving both Indians and non-Indians.  *Id.* at 1041.  The Ninth Circuit held that an Indian defendant could be convicted of a RICO conspiracy despite the fact that he could not be charged with the underlying cigarette trafficking predicate due to his Indian status. *Id.* at 1043.  This was so because his non-Indian co-conspirators could be charged with that racketeering act, and he could be convicted of conspiring with them to violate the law.  *Id.*  The defendant was guilty of a conspiracy "to facilitate the commission of contraband cigarette trafficking by others whose acts [were] indictable."  *Id.*  The Ninth Circuit expressly reserved judgment on "a situation in which a conspiracy exists only among [Indians]."  *Id.* at 1043 n.5.

Defendants cite 18 U.S.C. § 1162, a statute that grants several states jurisdiction over crimes on Indian reservations, as support for their narrow interpretation of § 1961(1)(A). Doc. 242 at 9-10. The Court finds § 1162 inapposite. Granting a state jurisdiction to prosecute crimes on reservations is very different from creating and defining a nationwide racketeering crime, as Congress did when it passed RICO. The fact that Congress chose in § 1162 to subject some reservations to state-court criminal jurisdiction says nothing about what Congress intended to include in its broad definition of the federal crime in RICO. This is particularly true in light of the fact that § 1162 was passed in 1953 and RICO was passed in 1970. RICO, Pub. L. No. 91-452, Title IX, § 901(a), 84 Stat. 941 (1970); Act of Aug. 15, 1953, Pub. L. No. 280, § 2, 67 Stat. 588 (1953) (enacting 18 U.S.C. § 1162). The Court cannot conclude that the intent of Congress in 1953 constrains its enactment of a different law, dealing with a different subject, 17 years later.

In summary, the Court is persuaded that the state-law references in § 1961(1)(A) are definitional – they define types of conduct reachable by the statute. This construction comports with the broad definition of racketeering activity apparent in § 1961(1), holdings of the Third and Sixth Circuits, and several Ninth Circuit cases that have reached similar conclusions. It is therefore irrelevant that the State of Arizona could not charge Defendants with the substantive state-law violations listed in Count 1.

**VI.    Motion to Sever Count 12 (Doc. 243).**[4]

Count 12 charges Gray with aggravated sexual assault in violation of 18 U.S.C. §§ 1153, 2241(a), and 2246(2). Doc. 131 at 18. The government presents the following facts. Gray and Leonard arranged to meet T.S. on the night of December 16, 2014, to conduct a methamphetamine transaction. Doc. 269 at 2. Gray and Leonard arrived at the

---

[4] Earlier in this case, Gray filed a motion to sever his trial from Leonard, and Leonard joined the motion. Docs. 114, 125. Thereafter, the government filed the Second Superseding Indictment, significantly expanding this case. Doc. 131. In light of this change in the contours of the case, the Court denied the motion to sever without prejudice to Defendants refiling the motion at a later date. Doc. 146. Defendants have not refiled the motion, but instead have moved only to sever Count 12.

remote meeting location in a truck, and T.S. arrived with his girlfriend, C.P., in a separate car. *Id.* After finishing the transaction, Gray shot and killed T.S. *Id.* Gray and Leonard then placed T.S.'s body in the trunk of T.S.'s vehicle. *Id.* With C.P. still in the passenger seat, Gray got in T.S.'s car and drove to a remote sheep camp. *Id.* Leonard followed separately in the truck. *Id.* at 3. During the drive, C.P. asked if Gray was going to hurt her and begged to be released. *Id.* at 2. After Gray and C.P. arrived at the camp, but before Leonard arrived, Gray told C.P. that he would not hurt her if she had sexual intercourse with him. *Id.* at 2-3. Gray then sexually assaulted C.P. *Id.* at 3. Leonard arrived shortly thereafter, and C.P. witnessed Leonard dismember and burn T.S.'s body while Gray removed items from T.S.'s car. *Id.*

Gray contends that the joinder of Count 12 was improper because the indictment does not identify sexual assault as a racketeering activity of the RSK, and sexual assault is unlike the other counts alleged in the indictment. Doc. 243 at 5-6. The government counters that joinder was proper because the sexual assault arose from the same act or transaction as the murder of T.S. and the kidnapping of C.P., both of which are charged in other counts. Doc. 269 at 3-5. Regardless of whether joinder was proper, Gray argues that severance is required because he would suffer undue prejudice at a single trial. Doc. 243 at 5. The government argues that Gray has not met the high burden of prejudice required to justify a severance. Doc. 269 at 5-6.

### A. Joinder Under Rule 8.

The Court first notes that Defendant has moved to sever under Rule 14(a), rather than asserting that Count 12 was misjoined under Rule 8. *See* Doc. 243 at 1. Defendant's arguments, however, focus almost exclusively on the joinder requirements of Rule 8. *Id.* at 3-6. The Court will therefore address whether joinder was proper.

Rule 8 provides for joinder of two or more offenses that (1) are of similar character, (2) based on the same act or transaction, or (3) constitute part of a common scheme or plan. Fed. R. Crim. P. 8(a). The validity of joinder "'is determined solely by

the allegations in the indictment.'" *United States v. Jawara*, 474 F.3d 565, 572 (9th Cir. 2007) (quoting *United States v. Terry*, 911 F.2d 272, 276 (9th Cir. 1990)).

Rule 8 is broadly construed in favor of joinder. *Id.* at 573. Generally, "[w]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *United States v. Anderson*, 642 F.2d 281, 284 (9th Cir. 1981); *see also United States v. Blatchford*, No. CR-16-08085-001-PCT-GMS, 2017 WL 2484182, at *1 (D. Ariz. June 7, 2017).

The allegations of the indictment suggest that the alleged sexual assault of C.P. is part of the same act or transaction as other counts. The indictment alleges that RSK is a street gang that commits acts of violence, including sexual assault. Doc. 131 at 4, ¶ 14. The indictment also identifies the sexual assault of C.P. as an overt act in furtherance of the RICO conspiracy. *Id.* at 12, ¶ 21.33. The indictment outlines the events surrounding T.S.'s murder, C.P.'s kidnapping, and C.P.'s sexual assault. *Id.* at 11-12, ¶¶ 21.27-33. Because the government alleges that the crimes involved the same perpetrators and the same victims on the same night, as part of one ongoing series of events, Count 12 is part of the same act or transaction as the crimes alleged in Counts 8, 9, 10, and 11.

The Court also concludes that Count 12 is part of a common scheme or plan. "[C]ourts generally permit joinder under this test where the counts 'grow out of related transactions.'" *Jawara*, 474 F.3d at 574 (quoting *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996)). The indictment specifically alleges that the sexual assault was an overt act in furtherance of the conspiracy charged against Gray, that it was part of the common scheme or plan, and that it grew out of related transactions – the murder of T.S. and kidnapping of C.P.

The Ninth Circuit has upheld joinder under this prong of Rule 8 in similar cases. For example, in *United States v. Kinslow*, 860 F.2d 963 (9th Cir. 1988), *overruled on other grounds by United States v. Brackeen*, 969 F.2d 827 (9th Cir. 1992), a prison escapee forced a family at gunpoint to transport him across state lines. 860 F.2d at 965. He then sexually molested one of the children. *Id.* The Ninth Circuit held that the charge

of interstate transportation of a minor for sexual purposes was properly joined with the other charges in the case because "[t]he incidents listed in the indictment all took place within the same 24 hour time period and they all made up part of Kinslow's common plan to get to California with the . . . family as his hostages." *Id*. at 966. The Ninth Circuit's more recent decision in *Jawara* cited *Kinslow* as an example of proper joinder under Rule 8's provision concerning a common scheme or plan. 474 F.3d at 574.

In this case, the indictment alleges that sexual assault was part of RSK's methods of operation and that the assault of C.P. furthered the alleged conspiracy by instilling fear and causing intimidation among those aware of RSK. It also alleges that the assault occurred in the midst of the murder and dismembering of T.S., who was C.P.'s boyfriend, and that this series of events created the fear-laden environment that caused C.P. to accede to Gray's demand. This is enough to satisfy the common scheme or plan element of Rule 8. Joinder of Count 12 was proper.[5]

## B. Severance Under Rule 14.

Rule 14 states that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "The granting or denial of a severance trial under [Rule] 14 is a matter within the trial court's discretion." *United States v. Doe*, 655 F.2d 920, 926 (9th Cir. 1980). "Severance is appropriate under Rule 14 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Stinson*, 647 F.3d 1196, 1205 (9th Cir. 2011) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Adequate jury instructions can, in appropriate cases, cure any risk of prejudice. *Zafiro*, 506 U.S. at 539.

---

[5] Gray argues that the sexual assault is not a predicate act for the RICO claim, Doc. 243 at 3, but the government notes in response that this is because sexual assault is not statutorily allowed as such an act. Doc. 269 at 5 (citing 18 U.S.C. § 1961(1)). The assault is listed as an overt act for the alleged conspiracy, and Gray does not contend that this is improper.

Gray fails to identify any specific prejudice that will result from a trial that includes Count 12. Nor does he identify any specific trial right that will be compromised. Because Count 12 is part of the events at issue in Counts 8, 9, 10, and 11, and certainly cannot be viewed as more prejudicial or heinous than the allegations in some of those counts – the murder of T.S., followed by dismembering and burning his body, all with C.P. present – the Court cannot conclude that trial of all counts together would be unfairly prejudicial to Gray.

The Court also notes that a separate trial of Count 12 would not necessarily create a more favorable environment for Gray. Prosecution of the sexual assault alone would likely still require evidence of the murder of T.S. and the kidnapping of C.P. Only with such evidence could the jury understand the government's allegations as to why C.P. was pleading for her life and Gray was able to take advantage of her fear to assault her.

The Court concludes that trial of all counts together will not be unfairly prejudicial to Defendant Gray. The Court will provide careful instructions to the jury, making clear that guilt or innocence on each count must be considered separately and that the jury cannot be influenced by passions, prejudice, or sympathy. The Court will entertain any additional instructions Gray proposes to eliminate any unfair prejudice that might result from a joint trial of all counts.

## VII. Count 1 – Alleged Unconstitutional Application to Gray (Doc. 248).

The conspiracy provision of the RICO statutes provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Count 1 alleges that Defendants conspired to violate § 1962(c). Doc. 131 at 6, ¶ 18.

Gray argues that § 1962(d), as broadly interpreted by the Supreme Court in *Salinas v. United States*, 522 U.S. 52 (1997), criminalizes mere membership in an organization and is therefore unconstitutional under *Scales v. United States*, 367 U.S. 203 (1961). Doc. 248 at 9-11. The Court disagrees.

*Salinas* did interpret the RICO conspiracy provision broadly, but it did not authorize conviction merely on the basis of membership in or association with a racketeering enterprise. To violate § 1962(d) as alleged in Count 1, Gray must have conspired with others to violate § 1962(c). As defined in *Salinas*, § 1962(c) is violated when a defendant (1) conducts, or participates, directly or indirectly, in the conduct of (2) an enterprise that affects interstate or foreign commerce (3) through a pattern of racketeering activity. 522 U.S. at 62. To be guilty of the conspiracy charged in Count 1, Gray must have agreed with others to commit the offense described in these three elements of § 1962(c).

Looking to traditional conspiracy principles, *Salinas* held that a defendant must "agree to pursue the same criminal objective." 522 U.S. at 63. In Count 1, that objective is violation of § 1962(c). The Supreme Court was clear: "A conspirator must *intend to further an endeavor* which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that *he adopt the goal of furthering or facilitating the criminal endeavor*." *Id.* at 65 (emphasis added). Although the defendant in *Salinas* was acquitted by the jury of committing the predicate offense of bribery with which he was charged, the Supreme Court found "ample evidence" that he conspired to violate § 1962(c): "The evidence showed that [another person] committed at least two acts of racketeering activity when he accepted numerous bribes and that Salinas *knew about and agreed to facilitate* the scheme. This is sufficient to support a conviction under § 1962(d)." *Id.* at 66 (emphasis added).

Thus, *Salinas* requires more than mere membership or association. To be guilty of conspiracy, the defendant must know about and agree to facilitate the unlawful scheme. The defendant need not personally commit the predicate offenses or agree to commit them himself, *id.* at 64, but he must know about and agree to the plan that someone commit the offenses – in this case, violation of § 1962(c).

Contrary to Gray's argument, this standard for criminal liability does not violate the due process principles identified in *Scales v. United States*. Considering a conviction

under the Smith Act for membership in an organization that advocates for the violent overthrow of the federal government, the Supreme Court in *Scales* specifically recognized the difference between mere membership and active membership. 367 U.S. at 226-28. It recognized that one who knowingly agrees to a criminal objective and intends to help achieve that objective can be found guilty of active membership: "we can perceive no reason why one who actively and knowingly works in the ranks of that organization, intending to contribute to the success of those specifically illegal activities, should be any more immune from prosecution than he to whom the organization has assigned the task of carrying out the substantive criminal act." *Id.* at 226-27. Just as *Salinas* held that knowledge and an agreement to facilitate a criminal scheme were required for a conspiracy conviction, 522 U.S. at 66, *Scales* noted that "guilty knowledge and intent" are required for a Smith Act conviction, 367 U.S. at 228. The Supreme Court's holding in *Salinas* is not inconsistent with *Scales*.

Count 1 adequately pleads conspiracy under *Salinas*. It describes the alleged RICO enterprise – RSK – in detail, Doc. 131 at 2-15, alleges that RSK affects interstate commerce, *id.* at 4, ¶ 13, and alleges that Gray and others "did knowingly, willfully and unlawfully combine, conspire, confederate, and agree" to violate § 1962(c) by "conduct[ing] the affairs of [RSK] through a pattern of racketeering activity," *id.* at 6, ¶ 18. The indictment then lists seven paragraphs of racketeering activities in which RSK allegedly engaged. *Id.* at 6-7, ¶ 18(a)-(g). Count 1 further alleges that "[i]t was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise." *Id.* at 7, ¶ 19. Count 1 also alleges the "manner and means" by which RSK operated, and lists 53 overt acts undertaken by Defendants in support of the conspiracy, even though overt acts are not required by § 1962(d). *Id.* at 7-15; *Salinas*, 522 U.S. at 63.

There can be no doubt that Count 1 alleges that Gray "knew about and agreed to facilitate the scheme" of operating RSK through a pattern of racketeering activity in

violation of § 1962(c). *Salinas*, 522 U.S. at 66. "This is sufficient to support a conviction under § 1962(d)." *Id.*

The jury instructions to be given at trial will make clear that mere membership in or association with RSK are not sufficient for conviction of the conspiracy crime charged in Count 1. Although their final form will be settled with input from the parties, those instructions will make clear that the government must show there was an agreement between two or more persons to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity, and the defendant became a member of the conspiracy knowing of its object to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and intending to help accomplish it. *See United States v. Francisco*, No. 11-01728-PHX-DGC, Doc. 624 at 26.

The Court may further instruct that:

> For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another.

> One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. . . . On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, or merely by knowing that a conspiracy exists.

> [M]embership in a gang, standing alone, cannot prove that an individual entered a criminal agreement to do an illegal act.

*Id.* at 23. Instructions such as these will protect Gray from a conviction based on mere membership in the RSK.[6]

---

[6] Although not expressly argued, Gray's motion also seems to suggest that Count 1 is insufficiently pled. Doc. 248 at 11-13. The Court finds that Count 1 fairly informs Gray of the charge against him and enables him to plead an acquittal or conviction in bar

**VIII.  Leonard's Motion to Suppress Physical Evidence (Doc. 236).**

Defendant Leonard asks the Court to suppress evidence gathered during a search of his family's property in Lukachukai, Arizona.  Doc. 236 at 1.  The Court finds the facts set forth in this section from the testimony of FBI Special Agents Ryan Butler and Sherry Rice, who testified at the hearing on August 18, 2017, exhibits received in evidence at the hearing, and the parties' written briefing on this motion.

On February 6, 2015, at approximately 1:20 p.m., Agents Butler and Rice, and three or four Navajo criminal investigators and a uniformed Navajo police officer ("officers"), met at the Leonard property.  The property is located in a rural part of the Navajo reservation.  The Leonard property consisted of two trailers – one finished double-wide and one unfinished single-wide – enclosed by a barbed wire fence.  Several vehicles were parked in the yard around the trailers.  The Leonard family ran a steamed corn business on the property, and there was a sign reading "STEAMED CORN 4 SALE" next to the fence's gate.

The agents arrived in five or six unmarked vehicles and parked them outside the Leonard's gate.  Agent Butler honked his vehicle's horn to signal their arrival and initiate an encounter with the residents.  Receiving no response, Agents Butler and Rice walked through the gate toward the trailers.  Not far into the yard, the agents saw Lucille Leonard emerge from the double-wide trailer to greet them.  The agents identified themselves, showed Lucille their FBI credentials, and told Lucille that her son, Matthew, was recently arrested in a vehicle belonging to a missing person.  They told her that they would like to speak with her, Matthew, and Defendant Devan Leonard about the missing person's vehicle.  They asked Lucille if she would speak to them, and she agreed.  She found two chairs and sat down in the yard to talk with Agent Rice.  Devan Leonard was not home.  Agent Butler interviewed Matthew, who emerged from the single-wide trailer.

At one point during her discussion with Agent Rice, Lucille became agitated that some of the officers were looking around her property.  Agent Rice, who testified

of future prosecutions for the same offense.  The pleading is therefore adequate.

credibly at the hearing, could not recall if the officers were inside or outside the fence at the time. Around this time, Lucille said she might be having a heart attack, but then changed her mind and said she was okay. Agent Rice could detect no physical distress on the part of Lucille. She offered to call an ambulance, but Lucille declined and the interview continued.

Near the end of his interview of Matthew, Agent Butler asked for consent to search the property. Doc. 236-1 at 31. Matthew said the agent should ask his mother, Lucille. Agent Butler then approached Lucille, who was still talking with Agent Rice, and said:

> I asked Matt if it would be okay if I look around inside the trailer and – and make sure there is nothing that would point back to that guy or the Ford Taurus. And he said that it was fine with him, but that I – I – that I should run it by you since this is, you know, your home.

*Id.* at 45-46. Lucille's response to this first request was equivocal. She said "I don't know," and then immediately added "I'm not saying . . . not to." *Id.* at 46. Agent Rice then shared that "it might be best if we got a consent to look around for – if we got a consent, then it wouldn't come back on you." *Id.* Agent Butler said that they were not trying to get anyone in trouble, but it "looks weird" that Matthew was found in the missing person's car. *Id.* at 47-48. He said they did not want this to reflect badly on Lucille's family if the family was not involved in the missing person's disappearance. *Id.* Lucille said she understood, and Agent Rice made a second request: "if what [Agent Butler] is saying makes sense, let's make a little paper so that way you don't get – nobody blames you for us finding something." *Id.* at 48. After a passerby distracted them, but before Lucille could convey a response, it appears Agent Rice began filling out a consent form by requesting the address of the property. *See id.* at 48-49.

Around this time, a school bus arrived and Lucille expressed concern that her daughter was going to "freak." *Id.* at 49. Shortly thereafter, Agent Rice made a third request for Lucille's consent. *Id.* at 50-51. Lucille's said "Yeah, you can." *Id.* at 51. Immediately thereafter, however, Lucille questioned whether she had authority to consent

because the property belonged to her father-in-law. *Id.* After confirming that Lucille had access to and had lived on the property for a long time, Agent Rice said that Lucille did have authority to consent. *Id.* Still unsure, Lucille asked if she could call her father-in-law. *Id.* Agent Rice said that Lucille could call whomever she wanted, but added that "we're trying to get in and out of here as fast as we can[] because I know you don't like we're attracting attention." *Id.* at 51-52. Agent Rice then reiterated "[i]t's up to you[] though. So legally, because you live – you've lived here for a long time, you can say we can look." *Id.* at 52. Lucille then said "Okay. And this is going to be our house[.]" *Id.* Lucille then read and signed the consent form, and said: "You guys [have] no qualms? I have no qualms." *Id.*

The discussion about Lucille's consent lasted approximately seven minutes, and occurred after the agents had been talking with Lucille and Matthew for more than 40 minutes. Docs. 267 at 8, 268. The audio recording of the discussion reveals that the agents were polite and respectful throughout. Doc. 268.

### A. Voluntariness Analysis.

Leonard argues that Lucille's consent was involuntary, which would make the subsequent search a violation of the Fourth Amendment. Doc. 236 at 1. The Fourth Amendment prohibits unreasonable searches and seizures. To safeguard this right, police generally must obtain warrants before searching private property. *Katz v. United States*, 389 U.S. 347, 357 (1967). A warrant is not required, however, when an individual voluntarily consents to a search. *Fernandez v. California*, 134 S.Ct. 1126, 1132 (2014).

The government bears the burden of showing that a consent to search was voluntary, and "must show that there was no duress or coercion, express or implied, and that the consent was unequivocal and specific and freely and intelligently given." *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (internal quotation marks omitted); *see United States v. Basher*, 629 F.3d 1161, 1167 (9th Cir. 2011). Although courts should look to the totality of the circumstances to determine whether a consent to search is voluntary, the Ninth Circuit has identified five factors to consider: (1) whether the

person giving consent was in custody, (2) whether the officers had their guns drawn, (3) whether a *Miranda* warning was given, (4) whether the person was told that she had the right not to consent, and (5) whether the person was told that a search warrant could be obtained. *Basher*, 629 F.3d at 1168. No single factor is dispositive, and many decisions upholding consent are supported by at least several of these factors. *Id.* The Court will address the five factors.

First, Lucille was not in custody when she gave consent. She approached the agents after they entered the gate and began walking toward her home; she did not ask the agents or officers to leave; she agreed to be interviewed, and helped locate chairs for her and Agent Rice to sit; she remained on her property, outside her home, at all times; her adult son, Matthew, was also on the property and outside the home; the agents and officers did not physically restrain her and were dressed in plain clothes (with the exception of the Navajo police officer, who remained outside the gate); the agents told Lucille that she would not be placed under arrest, Doc. 236-1 at 51; and the agents spoke to Lucille in a courteous, non-threatening manner. Lucille was 45 years old and familiar with the criminal justice system, having been convicted of two felonies and a misdemeanor. The encounter occurred in the early afternoon, not in the dark of night, and Lucille was never in a confined area. The Court cannot conclude that "a reasonable person in those circumstances would have 'felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Leonard seems to agree with this conclusion when he states, with respect to *Miranda* warnings, that "the law does not require them in this circumstance." Doc. 291 at 4. *Miranda* warnings, of course, are required only when a person is in custody. *Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990).

Second, as Leonard concedes, the agents and officers did not draw their weapons. Doc. 291 at 4.

Third, the agents did not read Lucille her *Miranda* rights. She was not in custody.

Fourth, the agents did not verbally advise Lucille of her right to refuse consent, but the consent form Lucille signed did advise her of this right. Doc. 266-1 at 4. Lucille confirmed to the agents that she could read and write English before she signed it. Doc. 236-1 at 51. The agents watched Lucille read the form before she signed it, and her signature appears below the line indicating that she could refuse to consent. Doc. 266-1 at 4. On these facts, the Court finds that Lucille was informed of her right to refuse. Defendants note that the form says Lucille has been informed of her right to refuse consent, something Defendants argue did not occur verbally before she signed the form, but Lucille read and signed the form and the Court finds credible Agent Rice's view that the form itself informed Lucille that she could refuse.

Fifth, the agents never told Lucille that they could get a warrant to search the property if she refused. The Ninth Circuit has noted "that the application of the fifth factor depends on the particular circumstances of the case." *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000). In some cases, the failure to inform a consenting party that a search warrant could be obtained may support a finding of voluntariness – telling them that a warrant could be obtained could amount to "threatening a defendant with a search warrant" and a suggestion that "'withholding of consent would ultimately be futile.'" *Id.* (quoting *United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994)). In other cases, failure to inform may support a finding of involuntariness where it "constitute[s] a failure to apprise [the consenting party] of all his legal rights." *Id.* (citing *United States v. Torres-Sanchez*, 83 F.3d 1123, 1130 (9th Cir. 1996)). In this case, the agents clearly did not use the threat of a search warrant to coerce Lucille to consent.

Thus, when the five traditional factors are considered, all five favor a finding that Lucille's consent was voluntary.[7]

---

[7] Even if one could conclude that Lucille was not informed of her right to refuse consent, the Ninth Circuit has explained that "[a]n officer is not *required* to inform the person being searched that he has a right to refuse consent; doing so simply weighs in favor of finding consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 n.6 (9th Cir. 2010) (emphasis in original); *see also United States v. Drayton*, 536 U.S. 194, 206-07 (2002); *United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (explaining that it is not necessary to satisfy each of the five factors).

## B.    Other Arguments.

Leonard asserts that the agents violated the Fourth Amendment by entering the curtilage of the Leonard property when they walked through the gate.  The Fourth Amendment applies to the curtilage of a home.  *Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013).  "Like searches and seizures inside the home itself, 'searches and seizures in the curtilage without a warrant are also presumptively unreasonable.'"  *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016) (quoting *United States v. Perea–Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012)).  The Court must decide whether the fenced area around the trailers was curtilage.

The Supreme Court has identified four non-exhaustive factors for making this determination:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987).  The goal is to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  *Id*.

This is a close question.  On one hand, the Leonards' home was clearly fenced, and the area enclosed by the wire fence appears to have been reasonably close to the trailers, particularly given the home's rural location.  Doc. 266-1 at 2; *see United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001) ("realities of rural country life dictate that distances between outbuildings will be greater than on urban or suburban properties and yet still encompass activities intimately associated with the home; this is the nature of the 'farmstead.'"); *see also Dunn*, 480 U.S. at 302 ("Viewing the physical layout of respondent's ranch in its entirety, . . . it is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house.").

On the other hand, it is apparent from a photograph of the property that no effort was made to protect the area enclosed by the barbed wire fence from observation. *See* Doc. 266-1 at 2. In addition, the property included a large sign offering steamed corn for sale. *Id.* Indeed, Lucille told the agents that customers came at all hours of the day and night to buy corn: "They run – they run around. And then when I'm sleeping, I tell him, stay up, son, because we got customers coming 24/7 and then a big order is coming in, so he's working on it." Doc. 236-1 at 53.

Thus, two of the factors favor finding the Leonard's yard to be curtilage, while the other two factors lean in the opposite direction. The Ninth Circuit has explained, however, that "combining these factors does not produce a finely tuned formula that, when mechanically applied, yields a correct answer to all extent-of-curtilage questions." *United States v. Duenas*, 691 F.3d 1070, 1081 (9th Cir. 2012) (internal quotation marks and citation omitted). The "centrally relevant consideration" is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* (internal quotation marks omitted). On balance, the Court concludes that the fenced area around the Leonard's home should be regarded as curtilage.

But this does not end the inquiry of whether the agents violated the Fourth Amendment when they entered the gate. Courts recognize a "knock and talk" exception to the prohibition on entering the curtilage without a warrant. As the Ninth Circuit has explained, "[t]he relevant 'consent' in a 'knock and talk' case is implied from the custom of treating the 'knocker on the front door' as an invitation (*i.e.*, licensee) to approach the home and knock." *Lundin*, 817 F.3d at 1158. "[T]o qualify for the exception, the government must demonstrate that the officers conformed to the habits of the country, by doing no more than any private citizen might do." *Id.* (internal quotation marks and citation omitted). "In the typical case, if the police do not have a warrant[,] they may approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* (internal quotation marks omitted).

As the Ninth Circuit explained in a case relied on by Leonard, "[t]he constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home." *Perea-Rey*, 680 F.3d at 1188.

The Court finds that the agents' actions in this case were consistent with an attempt to initiate consensual contact with the occupants of the home. The agents and officers parked their vehicles outside the Leonards' fence and, as apparently is the custom on the reservation, honked. When they received no response, the agents walked through the gate to knock on the front door. They were met by Lucille shortly after passing through the gate, identified themselves, and asked if she would speak to them. Lucille agreed. Thus, even though the area within the fence was curtilage, the Court cannot find that the officers violated the Fourth Amendment when they entered for a "knock and talk." This factor does not favor a finding of involuntariness.[8]

Leonard also contends that the agents misinformed Lucille about the reasons for their request to search her home. Specifically, he notes that the agents suggested they only wanted to search the property to clear the Leonard family, and that they weren't looking to get anyone in trouble. In fact, Leonard asserts, the agents were there to search for evidence of his involvement in the murder of T.S. Agent Butler testified that they were there to find relevant evidence, whether it implicated or exonerated Leonard or members of the household, not to get people in trouble. The government notes that the agents correctly told Lucille that Matthew had been arrested in a missing person's vehicle (T.S.'s vehicle), and that the agents wanted to search to see if anything in the house linked the Leonards to that vehicle or the missing person – true statements.

The agents' statements to Lucille were incomplete – they did not disclose all of the reasons the agents were there – but the Court does not find the statements inappropriately deceptive. The Court cannot accept Leonard's implied assertion that the agents were

---

[8] Counsel for Leonard elicited testimony from the agents that honking a horn was a commonly observed "courtesy" on the Navajo reservation, but elicited no testimony that then approaching the home to knock on the door is forbidden by reservation custom.

obligated to tell Lucille that they were investigating the murder of T.S., they had reason to suspect that Devan was involved, and they were looking for evidence related to the murder. As Agents Butler and Rice testified, revealing all law enforcement knows about a crime can cause evidence to disappear. Moreover, it can make it difficult to determine whether witnesses and suspects know facts on their own or are simply repeating what they have heard from enforcement's public disclosures. In addition, as the government notes, courts have recognized that law enforcement officers may use some deception in criminal investigations. *See United States v. Glassel*, 488 F.2d 143, 145 (9th Cir. 1973) ("Under the rule of *Lewis v. United States*, 385 U.S. 206 (1966), an officer may legitimately obtain an invitation into a house by misrepresenting his identity . . . . If he is invited inside, he does not need probable cause to enter, he does not need a warrant, and quite obviously, he does not need to announce his authority and purpose.").

Leonard cites several other considerations. He notes that Lucille equivocated several times before agreeing to sign the consent form; the arrival of the school bus added to Lucille's sense of urgency in signing the form; several law enforcement personnel were present, and some remained near the gate throughout the discussion; at one point Lucille suggested she was having a heart attack; the agents said they would get in and out quickly so as to avoid attracting attention; and the agents suggested to Lucille that the consent form would protect her from blame.

Considering these facts among the totality of the circumstances, the Court finds that the government has met its burden of showing that the search was constitutional. As noted above, the five traditional factors suggest the consent was voluntary. Leonard's argument about invading the curtilage does not weigh against this finding in light of the "knock and talk" exception. And although the agents were less than fully forthcoming in what they knew about T.S.'s murder and her son's potential involvement, the Court cannot find that Lucille's consent was involuntary. The Court is strongly influenced by listening to the recorded conversation with Lucille. The agents were polite and respectful; there were no threats; Lucille agreed to the consent verbally; Lucille read and

signed the consent form; after signing the consent form, Lucille said "I have no qualms"; and, as the agents testified, Lucille then proceeded to show them around the property and inside the trailers, never expressing a desire to withdraw her consent.

**IT IS ORDERED** that the motions at Docs. 225, 229, 234, 236, 242, 243, and 248 are **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from _____ to ____.

Dated this 25th day of August, 2017.

_____
David G. Campbell
United States District Judge